UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DIANE TROYER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:09 CV 89 |
| | ) |
| THE BOARD OF TRUSTEES OF | ) |
| PURDUE UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

# OPINION and ORDER

Plaintiff Diane Troyer filed this action alleging retaliatory discipline and termination of her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII.") In brief, Troyer, who supervised other employees, alleges that when she objected to being forced to terminate one of them, and then assisted the employee in pursuing a discrimination complaint, her own supervisor, Tamra Emilson ("Emilson"), began to retaliate against Troyer. When Troyer filed her own EEOC charge concerning this retaliation, her employment was terminated in retaliation for doing so as well as in culmination of the previously-existing retaliation. The case is now before the court on defendant The Board of Trustees of Purdue University's ("Purdue") motion for summary judgment. (DE # 24.)

RULE 56 of THE FEDERAL RULES OF CIVIL PROCEDURE states that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A summary judgment is required, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (commenting on portions of RULE 56(c) which, as of December 1, 2010, are in subpart (a)). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe,* 42 F.3d at 443.

*SUMMARY OF UNDISPUTED FACTS*

Very few of the evidentiary facts are in dispute in this case; it is the inferences which may be drawn from those facts on which the parties disagree. In the summary that follows, the court refers only to undisputed facts, or, if there is a dispute, notes that it exists and relies on the version of the fact, or inference therefrom, that is most

2

favorable to Troyer. This summary provides an overview. Additional relevant undisputed facts will be referred to in the analysis that follows.

Troyer was the Business Manager of Purdue's Physics Department; Emilson was the Director of Financial Affairs for the College of Science, supervising Troyer and other departmental business managers. Starting in the summer of 2006, Emilson told Troyer that one of the subordinates Troyer supervised, Sharon Wooden, needed to be replaced, and Emilson began "putting a lot of pressure" on Troyer to do so. (Troyer Dep., DE # 26-2 at 107-08.[1]) As a result, in November 2006, Troyer wrote Wooden a memo as the first step in Purdue's progressive disciplinary process, and Troyer believed Wooden's performance improved after that. (*Id*. at 110-11.) Troyer informed Emilson of the improvement, but Emilson said that she thought that Wooden "was not good enough and she wanted her out of the department." (*Id*. at 111.) Emilson didn't believe that Wooden's performance was up to par. (Troyer Dep., DE # 26-2 at 140-41.)

Troyer resisted Emilson's direction to terminate Wooden because she believed that Wooden's performance was improving, and in addition, she felt that none of her subordinates was performing at an acceptable level, and because Wooden was the only African-American in the office, she had it "cross [her] mind" that race might be a factor in the termination. (Troyer Dep., DE # 26-2 at 138-39.) Troyer did not communicate that concern to Emilson or anyone at Purdue at that time, however. (Troyer Dep., DE # 26-2

---

[1] Throughout this opinion, citations to page numbers refer to the page number stamped by the CM/ECF system, and not the document's own internal pagination.

at 139.) In December, 2006, Troyer gave Wooden a second written warning, which Emilson was "the driving force" behind. (Troyer Dep. at 121.) In February, 2007, as the result of "insistence" from Emilson, Wooden was given the option of being terminated or resigning. (Troyer Dep. at 137, 141.) She chose to resign effective May 16, 2007. (*Id*. at 141.)

Troyer then met with Monica Bloom, Purdue University's "Assistant Director for Conflict Resolution" in the university's affirmative action office ("AAO") concerning Wooden's termination. Troyer met with Bloom again in June, 2007, after Wooden filed an internal complaint against Troyer[2] with the AAO. In October, 2007, Troyer assisted Wooden's preparation of a discrimination charge to be filed with the EEOC, by providing documents to Professor Ephraim Fischbach, who was helping Wooden prepare the charge. (Troyer Dep., DE # 26-2 at 151.) Wooden filed her charge with the EEOC later in October. (*Id*.)

Troyer believes that Emilson began to retaliate against her in July, 2007, a month after Wooden filed her internal complaint with the university's AAO, by being critical of her and having a conversation that was "a little odd."[3] (Troyer Dep., DE # 26-2 at

---

[2] In her deposition, Wooden testified that her complaint was not against Troyer, but she had been advised by a faculty member who was assisting her that "it had to be setup against" her supervisor. (DE # 26-3 at 30-31.)

[3] In her complaint, Troyer alleged that Emilson "began" to criticize her performance at this time. (DE # 1 at ¶ 19.) As summarized herein, however, Purdue has provided undisputed evidence of criticism beginning with a somewhat negative performance review for 2004. Troyer's response is Emilson began "ratcheting up" her criticism in July, 2007, after Wooden's AAO complaint, as a way to retaliate. (DE # 27 at

4

162.) This was not the first time Emilson had criticized Troyer's performance, however. For example, Troyer's annual performance review for 2004 contained a number of negative comments, e.g., "[y]our staff feel you are too busy to help them with questions," "day-to-day operations that need improved [sic] . . . have not taken place," and "I do not feel your decision making and judgement is consistent with your years of experience." (DE # 25-2 at 19.) In the "General Comments" section Emilson concluded: "Overall, I have been disappointed in your lack of leadership in the Physics Business Office. . . . You need to turn the corner w/this office in 2005." (*Id*.)

On July 8, 2005, Emilson wrote Troyer a memo "to document the performance issues we will discuss in person." (*Id*. at 20.) Emilson outlined that Troyer's "performance during budget was very lacking" including "errors and missed dealines" demonstrating a "lack of understanding of the budget proces;" that the timeliness of Troyer's work was "sometimes an issue;" that Troyer's management of the office had "not seemed to improve;" and that "sound judgment seems to be lacking at times." (*Id*. at 20-21.) Emilson concluded the memo:

> I hope you will consider this feedback carefully and take steps to improve your performance. . . . I still believe you can be the right person to move the Physics Business Office forward if you rededicate yourself to the position and put a renewed emphasis on your staff and on business office operations. We will meet again in three months to discuss your progress.

(*Id*. at 21.)

---

17.) That is simply Troyer's characterization of the facts; among the issues in this summary judgment proceeding is whether that characterization is accurate and, if so, creates a genuine issue of fact for trial.

That meeting was held in November, 2005, and on November 15, 2005, Emilson wrote Troyer a memo "to document" the meeting. (*Id*. at 23.) In general, the memo noted that Troyer had made progress in many, but not all, areas, noted new areas of concern, and listed updated performance expectations. (*Id*. at 23-25.) Emilson's annual review of Troyer's performance for 2005, delivered in early 2006, was much better than it had been a year earlier:

> I am excited about the inprovement Diane has shown this year. She was performing at a very low level before but has really stepped it up over the last three months or so. I have seen vast improvement in all areas including attitude, initiative, leadership, responsiveness, and basic business office functions. I am very pleased with this turnaround.

(*Id*. at 29.)

On July 14, 2006, however, Emilson wrote Troyer a memo to document a meeting held between them on July 6 to discuss "several concerns" which resulted from Emilson's observations filling in for Troyer while Troyer was out, "in the interests of attacking issues as we learn about them and not waiting until much later." (*Id*. at 30) As one of her "three items of most concern," Emilson stated:

> [Expectations are not high enough for staff. Performing at the same level they always have is not acceptable anymore. . . . . Sharon [Wooden] was pointed out as a particular problem. She has not been held accountable for suspense cleanup . . . etc. She does not follow up promptly when asked to do things and she is bringing a child into the workplace for extended periods of time which is unacceptable.

(*Id*.)

6

On December 6, 2006, the physics-professor members of the "Physics Advisory Committee" sent a memorandum to the Physics Department Head, Professor Andy Hirsch, which stated: "As you are well aware there is considerable unhappiness with the operation of the business office." (*Id*. at 44.) After listing six specific problems, it stated:

> The consensus is that all these problems can be attributed to the business manager. In general any unhappiness with other employees (which is minimal) can also be traced directly to lack of direction and supervision on the part of the business manager.
>
> It is absolutely essential that the deficiencies in the operation of the business office be corrected and this requires action by the Head of the Department and the CoS [Emilson] business manager.

(*Id*.) The memorandum continued with recommendations including that the information therein be conveyed to Emilson, that it was "absolutely essential that the business manager position be changed from entry level" and that Hirsch "work with the college business manager to effect whatever changes are necessary to accomplish this end." (*Id*.) One of the members of the committee, Professor Nicholas Giordano, stated in his deposition that the memorandum was "the strong consensus view" of all the members of the committee. (DE # 25-7 at 6-7.) Giordano became the head of the Physics Department in July 2007. (*Id*. at 4.)

Emilson's written annual performance review of Troyer for 2006, delivered in early 2007, noted that she had "made many improvements this year," but concluded:

> *I agree that your performance suffers because half your staff is not performing up to expectations* and the other two are new to their duties but you still are

7

> not where you should be in terms of job knowledge, leadership, initiative, etc. after 4 years in the position. You too often make excuses instead of focusing on the issues you can influence & has [sic] not created a trusting, close relationship with your [department] Head like I feel you should after this many years with the same one. You must improve your organization, followup, job knowledge, and attention to detail on the documents you are signing in order to improve your performance. You must do something big to convince the vocal critics in Physics that you can/will improve or things will deteriorate to the point they can't be turned around.

(DE # 25-2 at 45) (italics are in original, but appear to have possibly been a formatting error).

In July, 2007—one month after Wooden filed her AAO complaint with the university—Emilson verbally expressed concern to Troyer about her performance. (DE # 25-2 at 47). A month later, on August 29, 2007, Emilson followed up by giving Troyer a written warning—the first step in Purdue's progressive disciplinary process—stating that "[a]fter over 4 years in the business manager position your skills, knowledge and leadership are not where they should be." (*Id.*) The memo listed key areas of concern, concluded that "failure to significantly improve your performance places your job in jeopardy, which could result in termination of your employment with the University," and scheduled a meeting for November 7, 2007, to assess Troyer's progress. (*Id.*)

That meeting took place on November 12, 2007, and Emilson summarized it in a "Final Written Warning" stating that as to the same areas of concern discussed at their last meeting, she had "not seen significant improvement in any of these areas and in

fact have become aware of new issues of concern in these areas." (*Id*. at 49.) After outlining her concerns, Emilson concluded:

> Due to your failure to show significant improvement your job is in jeopardy. We will meet on Monday, January 7, 2008, to again discuss your progress. If significant improvement is not demonstrated, further disciplinary action will be taken which will likely include termination.

(*Id*. at 51.)

On January 10, 2008, Emilson and Troyer met again and Emilson summarized the meeting in a memo with the subject line "Final Written Warning <u>Extension</u>." (*Id*. at 52.) This memo noted that "[p]ositive progress has been made to address a few of the specific problems that were previously identified" but that "many other things that have been previously identified continue to be a problem." (*Id*.) Emilson sated in the memo that the extension was "in recognition of the fact that several holidays occurred during the period since we last met on November 12. I wish to give you the full opportunity to meet the expectations of this position thus I am extending the final written warning period for another month." (*Id*. at 54.) the memo concluded, in nearly identical language to the prior "Final Written Warning:"

> Due to your continued failure to show significant improvement your job is in jeopardy. We will meet on Monday, February 11, at 4:00 p.m. to again discuss your progress. If significant improvement is not demonstrated, further disciplinary action will be taken which will likely include termination.

(*Id*.) On February 11, 2008, Emilson terminated Troyer's employment. (Id. at 55.)

Interwoven with the events above, and after Troyer was given the "Final Written Warning" but before she was given the "Final Written Warning Extension," Troyer filed her own charge with the EEOC on December 12, 2007, claiming that Emilson's treatment of her was in retaliation for her support of Wooden. (Troyer Dep., DE # 26-2 at 172.) After her termination, Troyer filed a second EEOC charge, claiming, as she does in this suit, that her termination was in retaliation for her support of Wooden and in retaliation for her having filed her own EEOC charge concerning that retaliation.

*ANALYSIS*

As relevant to the discussion that follows, Title VII's anti-retaliation provisions make it unlawful "for an employer to discriminate against any . . . employee[ ]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter," or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Colloquially, the first provision is known as the "opposition clause," and the second as the "participation clause." *Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 274 (2009).

In a case alleging unlawful retaliation under Title VII, a plaintiff may survive summary judgment by using either the "direct" or "indirect method" of proof to establish that a trial of her claim(s) is necessary. *Szymanski v. County of Cook*, 467 F.3d 1027, 1029 (7th Cir. 2006). Under the direct method, a plaintiff must point to evidence showing that she: 1) engaged in a statutorily-protected activity; 2) suffered an adverse

employment action; and 3) a causal connection exists between the two events. *See Smith v. Lafayette Bank & Trust Co.*, – F.3d –, –, 2012 WL 833163 at *2 (7th Cir. 2012) (stating elements in context of ADEA claim).

Under the indirect method, a plaintiff must show: 1) she engaged in a statutorily-protected activity; 2) she was meeting her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) she was treated less favorably than similarly-situated employees who did not engage in the protected activity.[4] *Id*. Once a plaintiff does so, the familiar "burden-shifting" method is employed: the defendant must articulate a legitimate reason for the adverse action and, if it does so, the plaintiff must then offer evidence suggesting that reason is unworthy of belief and a pretext to cover an unlawful employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

Purdue argues that whether Troyer is attempting to prove her case using the direct, or the indirect method, she lacks sufficient evidence to do so. As Purdue sees it, under the direct method, there is no causal connection between any of the events,

---

[4] The elements of a prima facie case vary based on the factual circumstances, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973), and the fourth element is a particularly slippery fish. The treatment of similarly-situated employees is relevant to, and so the fourth element in, traditional reduction-in-force cases, *see, e.g.*, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000); *Oxman v. WLS-TV*, 846 F.2d 448, 453-55 (7th Cir. 1988). In the present case, based on termination of employment, the fourth element is that the position remained available or was filled by someone else. *See, e.g.*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (fourth element rejected applicant must show is that position remained open and employer continued to seek similar applicants); *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1212 (7th Cir. 1985) (fourth element terminated employee must show is that employer replaced him).

because no evidence that Emilson knew that Troyer was assisting Wooden's pursuit of a discrimination claim, and because of the timing of Troyer's termination in relation to her own EEOC charge. As to the indirect method, Purdue asserts that Troyer has no evidence to show that she was meeting her employer's legitimate expectations, and also no evidence suggesting that Emilson's actions were a pretext to cover up retaliation.

*I. Troyer's Retaliation Claim Based on Her Support of, and Assistance to, Subordinate*

Under both the opposition clause and the participation clause, when a plaintiff is using the direct method to prove her retaliation case, to survive summary judgment she must have evidence of a causal connection between her protected activity and the adverse employment actions which she claims are retaliatory. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001); *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 674 (7th Cir. 2011). Obviously, a causal connection cannot be shown when the employer lacks knowledge of the employee's protected activities. *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 924 (7th Cir. 2007); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668-69 (7th Cir. 2006).

*A. Direct Method*

As outlined above, Troyer's direct supervisor, Emilson, was the person who wrote Troyer's negative performance reviews, who began the formal disciplinary process, and was responsible[5] for making the ultimate decision to terminate her. Purdue

---

[5] Obviously, Emilson did take into account the opinion of others, as indicated by her statement in Troyer's 2006 annual review that "You must do something big to convince the vocal critics in Physics that you can/will improve or things will deteriorate

12

argues that Troyer cannot establish a causal connection between her support of Wooden and the adverse actions Emilson took against Troyer because the undisputed evidence shows: 1) that Emilson was unaware that Troyer was opposing Emilson's desire to terminate Wooden because Troyer believed that Wooden's race was a factor;[6] and 2) that Emilson did not know that Troyer was lending any assistance to Wooden in connection with her internal AAO complaint or EEOC charge, before starting the disciplinary process resulting in Troyer's termination.[7]

As to the first aspect of this argument, Troyer asserts that there is a genuine issue requiring trial because the evidence shows that "Emilson knew of Troyer's vocal opposition to terminating the employment of Wooden." (DE # 27 at 2, ¶ 2.) The court has no doubt that it is true that Emilson knew that Troyer was opposed to terminating Wooden. That is completely irrelevant, however, unless Emilson knew that the reason Troyer was objecting to Wooden's termination was that she suspected unlawful discrimination was afoot; general complaints to an employer that fail to give the

---

to the point they can't be turned around." (DE # 25-2 at 45.) However, Troyer has pointed to no evidence showing that anyone other then Emilson had any significant involvement in the decision to terminate Troyer.

[6] Even as late as the time of her deposition in this case, Troyer refused to directly accuse Emilson of acting against Wooden based on Wooden's race. Asked if she thought that Wooden's race motivated Emilson decision to seek Wooden's termination, she responded: "I cannot accuse anyone of racism. I do not want to accuse anyone of that. It's a very ugly thing. Can't help but have it cross your mind that the one person singled out was the one African-American person." (Troyer Dep., DE # 26-2 at 139.)

[7] In her deposition, Emilson denied having any knowledge that Troyer assisted Wooden. (DE # 25-3 at 5.)

13

employer notice that the employee is opposing an activity made unlawful by Title VII are not a form of protected activity. *See Tomanovich*, 457 F.3d at 663-64. The only thing that Troyer ever communicated to Emilson was that she disagreed that Wooden's performance was poor enough to warrant termination. That is not activity protected from retaliation,[8] and so Troyer cannot defeat summary judgment on this basis.

As to the second aspect of Purdue's argument, that Emilson did not know that Troyer was assisting Emilson, Troyer argues that there is a genuine issue for trial because "Emilson was aware that Plaintiff assisted Wooden in her complaints and charges of discrimination against Defendant before she placed Plaintiff on progressive discipline." (DE # 27 at 2, ¶ 3.) As factual support for this contention, Troyer cites her own deposition at 156:1 -157:17. (DE # 27 at 2 n.5.) There is no need to quote those pages verbatim here, only lines 12-15 on page 157 are relevant.

At those lines, Troyer was asked how Emilson would know that Troyer had assisted Wooden, and she responded: "That information that was in the complaint and in the items that was submitted for mediation would have had to come from me because I was the [only] person who had access to that information." (Troyer Dep., DE # 26-2 at 57.) In other words, Troyer is relying entirely on her own surmise that Emilson reviewed the information in Wooden's complaint and the items submitted for mediation and would make that conclusion, rather than any evidence that Emilson in

---

[8] In other words, even though her opinion might have been wrong, if Emilson thought that Troyer was protecting a poor employee who needed to be replaced, she could view that as poor management by Troyer and act accordingly.

14

fact did so.⁹ Troyer has the burden, in responding to a motion for summary judgment, to point to evidence that creates a genuine issue of fact. *Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005). In the face of Emilson's specific denial of knowledge of Troyer's assistance, Troyer's mere supposition as to what Emilson knew is not sufficent to do so, and therefore is not enough evidence to proceed using the direct method on her claim that she was retaliated against for assisting Wooden.¹⁰

*B. Indirect Method*

Purdue argues that Troyer cannot establish a prima facie indirect case because the undisputed evidence shows that she was not meeting her employer's legitimate

---

⁹ For example, Troyer has not pointed to evidence that Emilson participated in the mediation; neither has she shown that Prof. Fischbach, to whom she provided documents to help Wooden, revealed that information to anyone.

¹⁰ In addition to her own deposition testimony cited in her statement of genuine issues, Troyer contends in the argument portion of her response that there is an issue of fact as to when Emilson learned of Troyer's involvement in Wooden's internal AAO complaint: the evidence shows that Monica Bloom interviewed Emilson regarding the complaint on June 15, 2007, contradicting Emilson's deposition testimony that she didn't learn of Wooden's complaint until November. (She also testified that she does not recall the meeting with Bloom.) The court agrees that there is an issue of fact as to when Emilson learned of Wooden's complaint. Troyer does not explain, however, how the fact that Bloom interviewed Emilson—which would be an expected part of her investigation—and so Emilson knew of the complaint, equates to knowledge that Emilson was assisting Wooden. Thus, this dispute is not material. It should be noted that Troyer herself is not even sure she ever informed Bloom that she believed Emilson's actions against Wooden were discriminatory. (Troyer Dep., DE # 26-2 at 149; 155.)

expectations.[11] This may be true, but it is unnecessary to consider the issue at this point. Using the indirect method, Troyer still must show that she engaged in statutorily-protected activity. As explained above, she has failed to point to any evidence showing that Emilson knew that the reason she opposed Wooden's termination was because she believed that unlawful discrimination was involved, or that Emilson knew Troyer was assisting Wooden. This is just as fatal to her indirect case as it was to her direct case. *Tomanovich*, 457 F.3d at 669.

*II. Troyer's Retaliation Claim Based on Filing Her Own EEOC Charge*

Purdue mirrors its argument on Troyer's retaliation claim involving support of Wooden, asserting that Troyer has failed to identify sufficient evidence to create an issue for trial using either the direct, or indirect, method.

*A. Direct Method*

As noted earlier, Troyer must have some evidence showing a causal connection between her protected activity—the filing of her EEOC charge—and her termination. *Clark County School Dist.*, 532 U.S. 268 at 272; *Leitgen*, 630 F.3d at 674. That connection is impossible to make based on the undisputed facts. In addition to a history of performance reviews which were, viewed in the light most favorable to Troyer, mixed at best, the formal disciplinary process leading to her termination started in August,

---

[11] Purdue also argues that Troyer fails to show evidence of similarly-situated employees who were treated more favorably than she. (DE # 24 at 19.) As explained above at n.4, this is not an element of her prima facie showing and so will not be discussed.

16

2007, four months before she filed her EEOC charge. She was give a final written warning on November 12, 2007, a month before she filed her EEOC charge on December 12, 2007. Based on this sequence of events, the culmination of which was her termination, its timing alone, after she filed her EEOC charge, is not sufficient evidence of a causal connection to create an issue of fact for trial. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008).

    *B. Indirect Method*

    Purdue argues that Troyer has not established an indirect prima facie case and, if she has, she has no evidence showing that the stated reasons for her termination are a pretext to cover unlawful retaliation. Purdue again asserts that Troyer cannot establish a prima facie case because the undisputed evidence—her history of mixed performance reviews leading up to a fairly poor review for 2006 (DE # 25-2 at 45), a verbal warning in July 2007, and Emilson beginning the formal disciplinary process a month later—shows that she was not meeting her employer's legitimate expectations.

    Troyer's response, in sum, is captured by her argument that "Emilson's criticisms were based on insignificant performance issues which did not have a major impact on Troyer's performance of the essential functions of her job." (DE # 27 at 21.) Troyer cites her own opinion of her performance to support this assertion, which is irrelevant, and ignores the harsh—but largely accurate—adage that "an employer can set unrealistic performance standards and fire an employee for not being able to meet them; he can . . . try to force a square peg into a round hole–and throw away the peg when it doesn't fit."

17

*Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989). The mere fact that Troyer doesn't agree with Purdue's expectations, as established by Emilson, isn't enough to establish her indirect prima facie case, and so there is no need to continue the analysis beyond that point and consider pretext. *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002) ("If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry"); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997) ("the prima facie case under *McDonnell Douglas* must be established and not merely incanted.")

## *CONCLUSION*

For the reasons explained above, Troyer has not shown that there are genuine issues of fact supporting the elements of her claims and requiring a trial, and Purdue's motion for summary judgment (DE # 24) is **GRANTED**. The clerk shall enter final judgment in favor of defendant The Board of Trustees of Purdue University.

**SO ORDERED.**

Date: March 28, 2012

 s/ James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT